Next case is the United States v. Manson. Your Honors, good morning. For Mr. Manson, Andrew Frisch. And let me start by saying that Mr. Manson's dispute today is not principally with Mr. Cafferone or the government. In fact, at sentencing, I commended my colleague. We have been litigating this case in one way or another for about ten years. I think this is our third or fourth trip to this court to litigate one thing or another. And I commended him on the record because at the end of the day, he changed the government's position. Perhaps he did it because he found my advocacy persuasive. Perhaps he did it to remedy what I claimed was a Brady violation. But we came to an agreement on the legal issues and the facts. The range was zero to six. There was no loss, no gain. The problem I have is that this court's recent decision in Ryan, which was November 2022, seems impossible to square with Judge Brown's record, with the record he made. Whether he called it a variance or a departure, he's talking, he's using language of departure. He's talking about, and this is what he said, I'm paraphrasing, I think the guidelines woefully understate the gravity of the offense. The guideline level makes no sense to me. I do think it understates the conduct. So he can call it what he wants, but he's using language of departure, and that required notice. So let me talk about notice. We had two sentencing proceedings before Judge Brown. He didn't hint at the possibility of an upward departure until the second proceeding, about 10 pages from the end, when he imposed the upward departure. And by the way, both of those sentencing proceedings followed multiple, over the course of literally years, applications to adjourn sentencing to avoid a Fatico hearing. Moreover, before sentencing, and this is undisputed, I said to the, this is in the record, I said to the probation officer, I said to his case manager, do we need an amended PSR? And they both said, no, it's zero to six. We don't need it. But put that aside. There's no amendment to the PSR that either endorses or refutes the government's letter. And of course, we know from practice, and we know it's the fact here, there was no independent investigation of the facts conducted by the probation office. They relied on the government's information. And then when the government changed its view, they remained silent. So whether or not the case manager said that to me, which she did, and the probation officer said that to me, which she did, they didn't respond to this. And so that's not a basis for what Judge Brown did. And I've made it clear in my papers. I understand what I, what the sentencing was about, as from our perspective, was you've got conduct, which is not good, but you've got a whole bunch of mitigation. And so nine years of pretrials, supervision without a hiccup, an autistic son, and all that, the issue is where within zero to six is the judge going to balance all that? And I have no reason to think otherwise until 10 pages toward the end of the second day of sentencing. And I'm not a bashful lawyer. If I had reason to ask for a Fatico hearing, I had been talking to Mr. Cafferon about it literally for years. I had litigated whether or not, and I mean this with due respect. We get along, notwithstanding the record of the case. I had talked to him about the need to disclose what I consider to be exculpatory information and the need to litigate all that. Is this the spreadsheet you're referring to? I beg your pardon? Is this the spreadsheet? Exactly. How is that exculpatory? Fair enough. That's all their data. The government took the position with regard to Callahan. By the way, they changed their position with regard to Manson. But with regard to Callahan, they said if you want credits Callahan, we've got to recalibrate the credits. It's no longer $100 million like it says in the plea agreement. We have to up it to $140 million to accommodate the credits. The reason why it's Brady is that we gave this financial data on behalf of both defendants to Mazars. We used a credible and reputable outfit to say can you tether the credits to the specific allegations in this very specific indictment? And Mazars said yes. And if you tether the credits to the allegations, there's no loss. Certainly for Manson, there's no loss. And my point is not that at the end of the day Judge Brown is right or wrong, but we don't know that. Mr. Manson had a right to be sentenced on accurate and reliable information, and the absence of advance notice prevented me from asking for a FATICO hearing. But assuming it was a departure rather than a variance, which is what the trial judge called it, when it comes to the issue of notice, didn't your client have notice or is it correct that the trial court err in noting that at the first sentencing hearing the court adjourned sentencing and asked for briefs, specifically on the court questioning whether post-indictment or post-lease sale or recovering of assets is not credited under the guidelines. So the court expressed concern about the calculation and ordered both sides to file briefs, and it indicated that your client did not file a brief. So wasn't your client on notice or? We were on notice that the judge had concerns. So much is clear. We were not on notice that the judge was contemplating an upward departure beyond the 0 to 6. Judge Brown, both in the, I think it was May was the first proceeding, and then subsequently in the proceeding in, I can't remember the month, but thereafter, said, I have questions about this. I have concerns. I'm not sure you're right. We shouldn't be here, with due respect, parsing out what Judge Brown meant or didn't mean. We should have advance notice, as is typically done by district judges. I'm contemplating an upward departure on this ground. Be advised. We shouldn't be parsing back. And by the way, when the government responded to the judge with a 13-page letter, they took our position. They took the position supporting the view that the guidelines were 0 to 6, that there was no loss and no gain. And I would add one other thing. I see I'm out of time, but let me make this one last point. It's a huge, there are some huge factors in mitigation here. Putting aside the autistic son, it is a fact, it is not disputed on the record, that the government demanded $2.5 million at the time of the guilty plea, because in fairness to the government, they didn't know how much the panoramic would be sold for at that time. That's fair. But it was sold at a $2 million profit to the investors, and he still overpaid to the tune of $2.5 million. Judge Brown had a problem accepting the truth of that. Had I had advance notice, and I'm not a bashful lawyer, I would have said, let's have a hearing. I'll put Manson on the stand. I'll put my guy from Mazar's on the stand, and I'll prove everything I'm saying. Counsel, you're right, we have kept you up beyond your time. But if you'll indulge me, I have a question about the appeal waiver. Look, I get it. You think that there were mistakes that were made at the hearing, and we might agree or disagree. But isn't the very principle of an appeal waiver, it's a waiver of errors. And you say, look, I'm going to give up my right to appeal as long as I get something that's not higher than X. In this case, X is 60 months. That presupposes that you might, in fact, have something to complain about. The plea agreement doesn't identify or limit that to a subset of errors like a guidelines miscalculation or a factual error or a discretionary misbalancing of the 3553A factors. It's categorical. It's across the board. So could you just explain to me why, in some respects, on your client's part, this isn't just buyer's remorse. Look, he signed up for an appeal waiver. He didn't see this coming. He estimated wrong. Maybe everybody estimated wrong. But the language is categorical, and we have very limited exceptions to enforcement of an appeal waiver. So if you could maybe address that question. Let me say a number of things about that. This isn't a misestimate. This is going from $100 million fraud to zero. This is disavowing the indictment. And there has to be- It goes from zero to 60 months. But my point is the scope of the appeal waiver is measured in terms of degree or quantity by an error that could go up to 60 months. And if your client had been given 61 months or something, you know, beyond a statutory maximum, then sure, it all goes out the window. But that is the scope of the potential error, whether based on a misestimate of loss or a misestimate on the part of the district court of the relative culpability of the defendant, whatever it might be. If the error goes up to what lands in a sentence that is no more than 60 months, it's waived. So why is it that the waiver doesn't apply here? Because as this court has said, I think it's ridgy, but in any event, the cases are cited in my brief. Because of the imbalance of power in the government in getting these waivers, they can't be categorically validated. The court has to look and see how it came about and whether the expectations of the parties in agreeing to the waiver or in having the waiver in the plea agreement- Have we said that, that they're not categorically validated? Yes, you have said that. And that we have very narrowly circumscribed exceptions. We don't, on a case-by-case basis, say, well, let's look at what the power imbalances were, let's see how big the mistake was. The size of the mistake is measured by the scope of the waiver. I respectfully disagree with the court's interpretation of what the court has said in other cases. The courts talk about when a procedural infirmity is such as this. Again, I think the case is ridgy, but I'll stand by the cases. The court looks to the circumstances to see if it's appropriate to apply the waiver or not. It doesn't mean that it's too great a variance or buyer's remorse, as your honors put. The court has said, we're going to look and see what happened. And if you want an example of that, look at Ryan, which was November 2022, where the court talked about the claim procedural infirmity of the sentence and the distinction between a variance and a departure. And by the way, in that case, it was deemed to be a variance and not a departure. Fact's different than this. And Judge Raggi, Judge Bianco, I can't remember who the third judge was, didn't even talk about the waiver. They addressed the argument and said, no, no, no, no, no, this is a variance and not a departure. You have here, whether or not this was actually a Brady claim, and I'm not saying that it necessarily was, but what happened here was not an estimate. I disagree with the court that these waivers should be upheld if you have a circumstance that's as unusual, atypical, exceptional, I think was your honors word, as happens here. There's a Brady claim precisely based on the claim that this case was horribly exaggerated from the beginning. The government said that the arguments that they ultimately accepted in 2022, three or four years earlier, don't hold me to the date, they said defied common sense. That kind of change, that kind of $100 million to zero, that kind of disavowing the theory of the indictment is precisely the kind of, whether it's exceptional circumstances or narrow circumstances, that the court should look at carefully before saying, aha, there's a waiver. You got less than the waiver, and that's because of the imbalance of power. We got a five-year statutory maximum in this case, and to get that, we had to waive. And we did. This wasn't a stipulated guideline range. Well, can I ask you this? I understand in this case, obviously, your client has an interest in arguing that the waiver is inapplicable. But from a larger standpoint, isn't this, if our court were to start engaging in a much more case-by-case analysis of, well, we're going to see whether we think the waiver's fair, whether we'll apply it or not, that means it winds up, they wind up being overall, on average, less valuable to the government, which then, on average, means that defendants will have less of a bargaining chip with the government, saying, well, I'll do X. Look, I'll give you an appeal waiver, so, therefore, do this for me. Drop other charges or whatever. So, in other words, the more riddled with holes appeal waivers are, the less defendants, ex ante in their bargaining position with the government, have to trade. So I'm just concerned that, yeah, it may benefit a defendant in one case to second-guess an appellate waiver, but it could, in the long term, we're down to the detriment of defendants everywhere, on average. Could you just respond to that? Sure. So let me say two things about that. Number one, there's no question that appellate waivers have been upheld, and they provide a benefit to the negotiation process and often to both sides. That doesn't mean that the court should look at a waiver and validate it, no matter the unusual circumstances that are presented. The court has to look beyond the waiver and say, what happened here? What was the expectation of the parties at the time? It's not that it was a five-year statutory, it was 60 months, and now it's zero. How did we get there? What happened? Was there a Brady claim? And when we get to zero to six, and the court upwardly departs and calls it a variance and doesn't give it advance notice, that strikes me as being highly unusual, and a circumstance where, at least it appears to be in Ryan, the court didn't discuss or think that the waiver applied. And one last thing. At the end of sentencing, the second day of the sentencing proceeding, Judge Brown said you didn't waive your right to appeal, and Mr. Cafferone said nothing about that at the time. That doesn't matter. Well, it's not irrelevant. It's not binding on the court, but nor is it irrelevant, because Judge Brown has seen hundreds and thousands. So we got it wrong. I mean, we all get stuff wrong sometimes. Well, you have to, I get, I understand. I mean, I've seen that many times, district courts, by the time you get around to sentencing, forget about what was said at the time of the plea. They advise the defendant of their rights to appeal, and then either somebody jumps up or forgets to and says, oh, Your Honor, there's an appeal waiver in the plea agreement, and the judge says, oh, right, I forgot. I'm not saying you're bound by it. I'm just saying it's something the court should consider, and I think, Your Honor, more so than what Judge Brown had on his mind or didn't have on his mind, the court should consider what Judge Raggi, Judge Bianco, and I can't remember the third judge on that panel, had on their mind in looking at the procedural infirmity in Ryan without considering the waiver. But more important than even that are the highly unusual circumstances of this case where there's a Brady claim. I'm not saying the Brady claim was ever sustained. It was never, it wasn't, but it wasn't before the judge, before the government said, okay, it's not $100 million. It's zero. Thank you. We'll hear from the government. Good morning, Your Honors. My name is Chris Cafferan. I'm Assistant United States Attorney for the Eastern District of New York, and I represent the United States. First, Your Honors, I wanted to start with the appeal waiver. As the court was questioning Mr. Frisch about it, I looked. Rigi, the case that Mr. Frisch noted, actually states unequivocally that appeal waivers are presumptively enforceable. That's at page 147. The court's going to enforce an appeal waiver as long as it was knowingly, voluntarily, and competently entered. In this case, there's no allegation that the defendant, who was represented by a very able, retained, experienced defense counsel, advised him of that appeal waiver. It was explicitly in the plea agreement. The court at the time of the plea told the defendant, you're aware of your appeal, that you're waiving your right to appeal if you receive a sentence of 60 months or less. He acknowledged he understood that. In exchange for that, he received substantial benefits. He received benefits including reducing his statutory penalties from 20 years to five years. He received the benefit of the government's agreement to dismiss open counts with prejudice. Counsel, if we were to hypothetically agree with opposing counsel that the waiver of appeal were not enforceable now, in your view, would that vitiate the rest of the plea agreement? I mean, would the government then be able to say, well, okay, you know, you don't want to abide by the appeal waiver and the court's going to let you do that? Well, then that frees the government as well. Would that run the risk? And I'm not saying the government would do this, but would that, in your view, allow the government to say, okay, well, we don't want to dismiss the other counts. We want to go back and reopen them. Do you have a, I don't want to put you on the spot, but do you have a view on whether, what would be the consequence of our freeing one party from one part of the plea agreement? Your Honor, I haven't thought about that question. It's an interesting question. I think it would be a material breach of the plea agreement. And in the agreement, the defendant would, there are instances, for example, if the defendant were to commit additional crimes. In there, there's a paragraph that says, you can't withdraw your guilty plea, but the government then will be released from its obligations under this plea agreement. I think this would be similar to that. It's a material breach. This was an exchange promise in exchange for our significant concession. So I think it would and could potentially lead to such a detrimental effect on the defendant. You would leave the government in a position where are we going to now reinstate charges or take a position? This case is not necessarily the exact case for it, but let's say there wasn't a statute. Your Honor, I don't mean to suggest that you would or certainly not that the court would encourage anything. I'm just trying to figure out what dominoes could fall hypothetically in these sorts of situations. You could have dominoes, for example, it's not this case, but if you had a statutory mandatory minimum sentence where there was a negotiation back and forth and there was dismissals of 924C counts that were supposed to run consecutive, by breaching the plea agreement, now those could be potentially reinstated. You could have sentencing recommendations. In this case, he was capped by the 60-month statutory maximum. But you could have a case where it was a 20-year maximum. He's released, if he's not going to, if he's going to breach the plea agreement, then we're no longer bound by our agreement not to recommend an upward departure, recommend a specific sentence. So there are potential consequences that go well beyond just this case and go beyond just the defendant not sort of complying with the plea bargaining process. So hypothetically, in this scenario, if the statutory maximum, say, was 10 years, not, well, higher, 20 years, and the defendant had the same waiver, 60-month waiver, and let's assume Panoramic was not sold at a profit, then potentially the non-enforcement of a plea waiver could inure to his detriment because the government could argue for a higher loss over the 60 months, no? I agree, Your Honor. That could be something to the detriment of the parties there. In addition, one of the things I wanted to get to with respect to the appeal waiver as well was just this argument that somehow Judge Brown was abrogating the government's waiver. First off, that's not the law. The law of the circuit is pretty clear that a district court doesn't have the unilateral authority to void a material provision in the plea agreement. That's not what the court was doing. He rejected the entire plea agreement and told everybody to go back to scratch. Exactly. But he can't selectively edit the agreement. And that's not what he was doing. This was a protracted sentencing. It was at the end of a sentencing after he had had extensive arguments from the parties about the guidelines and then about the appropriate sentence and then had given the defense an opportunity to be heard again, and they asked him to reconsider his sentence. And at the end of a proceeding, I think district courts should take note and should advise defendants that they have a right to appeal because you're concerned about the timeliness of the notice. Well, in fact, I think that there's pretty strong case law that even when there is an appeal waiver, you still have to notify them of the right to the appeal. And in fact, as I recall, it's per se an effective assistance then not to file a notice of appeal upon request of the client even in the face of what you think is a valid appeal waiver. And that's always been my practice as well. Even where there's an appeal waiver, I will ask the court to notify the defendant that to the extent he hasn't waived his right to appeal, that he should consult with counsel and counsel should make a note that they're going to consult with the defendant on this to ensure that if the defendant wants to file an appeal, even if there's no merit to it, that it has to be done in a timely fashion. So that's all the district court was doing. His written order denying bail pending appeal made that clear as well. He didn't say there was no appeal waiver, this appeal waiver shouldn't be enforced. So it was clear the district court was just being careful with the notifying the defendant of his right to appeal, was not taking a position on an appeal waiver and certainly wasn't trying to unilaterally void that material term of the agreement. Could you stress the appellate's argument about this Brady or possible Brady claim as a factor in making this an exceptional case? This is not an exceptional case, Your Honor. That claim has been raised to the district court. It's been denied and rejected by the district court who was well positioned to assess that. They had the Mazur's analysis. It was done. Mr. Callahan, post-sentence, took a direct appeal. He then filed a 2255, filed a motion for disqualification of the U.S. Attorney's Office. The district judge, Mr. Manson, joined that. He raised the same arguments he's raising now. The district court, having presided over the case for six years, rejected that argument, considered Mazur's analysis to be flawed, had a very well-reasoned 30-plus page opinion, denied a certificate of appealability, took it up to the circuit. This circuit denied the certificate of appealability. He also, while that section 2255 was pending, filed a motion for bail pending appeal. That is Mr. Callahan. It was rejected. This court denied it on appeal, held that the breach of the plea agreement and the Brady violations were basically the same argument, and that the government's position redounded to his benefit. Throughout this process, the government has acted in good faith with both of these defendants. We've taken positions with respect to loss that significantly reduced their sentencing exposure. With Mr. Callahan, he was facing a 235 to 293-month sentencing guidelines range in the plea agreement. Probation said his guidelines range was 293 months. We took a position that it was 151 months. We cut it almost in half. With Mr. Catt, we gave him credits for offsets that the guidelines did anticipate, that this circuit doesn't require. We gave him offsets for the panoramic view, which was not collateral that was necessarily pledged, because we took a conservative approach to sentencing. We gave him offsets for redemptions that this court says you don't have to do in a Ponzi scheme. We laid this out in our sentencing memo. He didn't object to it at the time because his very capable retained counsel, Mr. Callahan, that is, realized this was to his benefit, because if he asked to challenge this, the court could have said, you know what, I'm going to go with probation. They have an intended loss here that's 293 months. He realized this range benefited him. This was not bad faith. It shows our good faith in these proceedings. Then when we got to Mr. Manson, we extended those same conservative approach. We gave him an offset for the panoramic view. It was not technically collateral pledge. It was never pledged. However, we took the approach we used with Mr. Callahan, we gave him that same benefit, and as a result, he reduced his sentencing exposure on the guidelines from 60 months to zero to six months. There was no Brady violation. There was no bad faith in this case. It was this argument has been repeatedly made and has been repeatedly rejected, and our conduct throughout this has done everything to benefit these defendants at sentencing, at the plea process, with giving Mr. Manson a five-year cap, with giving Mr. Callahan both defendants coverage for crimes they were charged with and some crimes they weren't charged with, like tax fraud. So this process, we've been fair to both defendants throughout. This is not an unusual case. With respect, I just wanted to quickly note, with respect to the variance issue, Mr. Frisch mentioned Ryan. Ryan actually is fatal to his claim. In Ryan, the district court actually used the words upward departure, which the district court didn't hear, and the court still found it was a variance because it looked at the rest of the record and the subsequent written statement of reasons. In this case, the word upward departure was never mentioned. There was no basis. Nobody mentioned the section of the guidelines that would fit with an upward departure. The court, as it's required to do, has to sentence a defendant based on the 3553A factors. Yes, the guidelines are one of those factors. It must consider them. It did. It said they woefully understated the severity of defense and the defendant's critical role in that offense. Those were undisputed facts. The defendant undisputedly was involved in a sophisticated cover-up of a financial scheme, and he falsified records that included tens of millions of dollars. He lied to auditors. This was not a one-time lapse in judgment. This spanned many years. Those are the facts that the district court relied on when imposing that two-year variance sentence. It made it clear in the written statement of reasons, and then it made it clear again in the denial of bail pending appeal. Thank you, Your Honors. So I cited the court to the wrong case, two-syllable named case that begins with R. It's not Ritchie. It's Rosa at a senior moment. Here's what the court said in Rosa. This is at page 29 of my brief. A request to review a case notwithstanding a waiver, quote, will cause this court to examine carefully the facts of the case and to look at the manner in which the agreement and the sentence were entered into and applied to determine whether it merits our review. No circuit has held these contractual waivers are enforceable on a basis that is unlimited and unexamined. We are not prepared today to outline an exhaustive list of the circumstances under which we would or would not accept an appeal that has nominally been waived. This was not conservative. Nobody has ever asked the government to explain, and this isn't the right forum to do it. This is appeal. We're not on district court. No one has asked, has ever, and Judge Spatton never did it. We didn't have argument before Judge Spatton. We didn't have fact-finding. He resolved it on the papers. Why can't you do what Mazars did? Why can't you tether the credits to the fraud like Mazars did? No one has asked that question. I haven't had an opportunity to think through Judge Nardini's question about the consequence to the plea agreement. I have in my mind there's a body of law that if you go to appeal and you win, there's a burden to go back and sentence the person to more than the sentence imposed. I just don't remember the intricacies of that law. I'm willing to take that risk on this record. We'll have a hearing. Mr. Manson has a right to be sentenced on reliable and accurate information, and Judge Brown did not agree on the facts to which the parties stipped. We agreed, and no loss, no gain, and that to which the parties agreed. And let me just make one last point, and I appreciate the Court's patience. There's no grounds, and at least in the typical case, there's nothing here to warrant an upward variance. Mr. Manson, apart from this, has no record. Nine years without a hiccup on pretrial services supervision. An autistic kid overpaying millions of dollars, not just the $2.5 million, but $1.6 million in forfeiture. The only basis, and I'm not saying it's theoretically an insufficient basis, is within the framework of the guidelines, which is why this is a departure. There was nothing in Ryan that it was a departure. All the facts were that it was the subject of a variance. Here, this could only have been an upward departure based on something within the framework of the guidelines, for which, through two sentencing proceedings, I was not given advance notice after we kept adjourning sentencing precisely to avoid a fatigue hearing. Thank you, judges. Thank you both. Very well argued on both sides. Thank you. Last case on the calendar for today. And so that being the last case, I'll ask the deputy to adjourn court. Court stands adjourned.